# ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

FILED
U.S. DISTRICT COURT

2009 NOV -6  PM 3: 37

CLERK C Adams
SO. DIST. OF GA.

| | | |
|---|---|---|
| JOHN WAYNE CONNER, | * | |
| | * | |
| Petitioner, | * | |
| | * | CIVIL ACTION NO. |
| vs. | * | CV 301-073 |
| | * | |
| HILTON HALL, Warden, | * | |
| Georgia Diagnostic and | * | HABEAS CORPUS |
| Classification Prison, | * | |
| | * | |
| Respondent. | * | |

## O R D E R

On October 6, 2008, this Court determined which claims in
the instant petition for writ of habeas corpus survive the
doctrine of procedural default and are thus entitled to a
merit-based review.  Petitioner John Wayne Conner ("Conner" or
"Petitioner") is a state prisoner currently incarcerated under
a sentence of death.   In the Order of October 6, 2008,
Petitioner was directed to file his "merits brief" and
admonished that "claims not argued in brief will be deemed
abandoned."  (Doc. No. 56, at 89.)  In his merits brief,
Petitioner argues three principal grounds for relief: (1)
trial counsel was ineffective in failing to investigate and
present mitigating evidence during the sentencing phase; (2)
the prosecution's conduct during closing arguments of the
guilt-innocence     phase     rendered     Petitioner's     trial

fundamentally unfair; and (3) the sentence of death was arbitrarily and capriciously imposed. These matters have been fully briefed.[1] Upon consideration of the briefs, the record of the case, and the relevant law, the Court finds that Petitioner is not entitled to the relief he seeks, and therefore his petition is **DENIED**.

## I.   PROCEDURAL HISTORY

On January 10, 1982, Conner was arrested in connection with the beating death of J.T. White in Telfair County, Georgia. A detailed statement of facts concerning the events surrounding the murder are set forth in the opinion of the Georgia Supreme Court, Conner v. State, 303 S.E.2d 266, 270 (Ga. 1983).

### A.   Trial Court Proceedings

On January 28, 1982, while he was in the Telfair County Jail, Conner was found pounding a bullet into his chest.[2]

---

[1]   Conner has abandoned all other claims that survived any procedural default challenge because without briefing the merits of these claims, Conner has not shown that he is entitled to relief.

[2]   The medical records state that Conner pounded the bullet until it exploded. (Resp. Ex. 20, at 143.) Another medical note reports that Conner had a "crude 'zip' gun which exploded and caused minor injuries to his hands." (Id. at 146.)

Consequently, he was admitted to Central State Hospital ("CSH") in Milledgeville, Georgia. (Resp. Ex. 20, at 143.) Upon admission, Conner was found to be "mute, uncooperative and appeared to be semicatatonic." (Id. at 140.) He showed "complete psychomotor retardation and [was] unable to answer any questions." (Id. at 144.) Conner was medicated and placed on "suicide precautions."[3] In the days following admission, however, Conner became cooperative and responsive. (Id. at 146.) This "rather rapid clearing of symptoms" suggested that his admission condition might have been secondary to substance abuse. (Id. at 147.)

Conner was hospitalized at the Central State Hospital by court order until February 19, 1982, while the staff evaluated Conner's sanity. (Resp. Ex. 2, at 4; Resp. Ex. 20, at 138.) During his stay, CSH staff produced a "Psychiatric Examination" and a "Final Summary Format." These documents revealed the following facts. Conner had longstanding conflicts with society and anti-social behaviors. (Resp. Ex. 20, at 145.) He had a history of drug and alcohol abuse. (Id. at 146.) Also, Conner had always been nervous and depressed and used the alcohol and drugs to alleviate these feelings, though the alcohol and drugs frequently accentuated

---

[3]   The medical records indicate that Conner may have attempted suicide on two prior occasions though no details are given. (Resp. Ex. 20, at 144.)

the feelings. (Id.) The medical notes indicate that although the results of personality testing suggested schizophrenia, the results were not inconsistent with a substance abuse disorder. (Id. at 148.)

On February 19, 1982, CSH issued a letter to the trial judge, in which Tolon A. Pamir, M.D., announced that Conner was competent to stand trial and could be held criminally responsible for his actions. (Resp. Ex. 2, at 7-8.) This letter also reported that CSH had found no evidence of a thought disorder or a psychotic process and that CSH's most significant finding was Conner's "continuous use of alcohol and drugs." (Id.)

In the underlying criminal case, Conner was initially represented by Mr. David E. Morgan III of Abbeville, Georgia, who had been retained by Conner's father. (See Resp. Ex. 4, at 5.) Mr. Dennis Mullis, a public defender, was appointed to represent Conner in an unrelated homicide case in Dodge County, Georgia, at about the same time.[4] (Id. at 7-8.) While it is unclear when Mr. Mullis was appointed to represent Conner, both Mr. Mullis and Mr. Morgan appeared on his behalf at the arraignment of the cases on April 7, 1982. At the arraignment, Mr. Morgan announced his concern that Conner's

---

[4]  The CSH records indicate that Conner was charged with this second murder in Dodge County while he was hospitalized there. (Resp. Ex. 20, at 140.)

4

father would not be able to pay him through the pendency of the case. (Id. at 5.) Consequently, the judge appointed Mr. Mullis as counsel of record in the instant case to assist Mr. Morgan. (Id. at 7.)

On April 30, 1982, Mr. Morgan filed a motion to bifurcate the trial and for funds to hire a defense expert to perform a mental examination. (Resp. Ex. 2, at 30-31.) Specifically, he asked that Conner receive two separate juries to determine criminal responsibility and his guilt or innocence because he "may exercise his right to raise the defense of insanity." (Id.) This motion was heard on May 11, 1982. At that time, the court had the benefit of the CSH letter of February 19, 1982.[5] Mr. Mullis stated that he could not determine if CSH had done anything wrong in its examination without an independent expert to assist him. (Resp. Ex. 5, at 4-5.) Nevertheless, the court deferred ruling on the motion because the defense had not yet filed a motion to raise the insanity defense. (Id. at 5.)

At a subsequent pre-trial hearing on June 21, 1982, Mr. Morgan announced his intent to file a motion to withdraw. The motion was granted and Mr. Mullis became sole counsel. (Resp. Exs. 7 & 8.) At a hearing on June 30, 1982, Mr. Mullis

---

[5] There is no indication in the record that the trial court had any other record or report from CSH.

announced that he would not be seeking to assert the insanity defense based upon his review of additional information Mr. Morgan had obtained at Central State Hospital. (Resp. Ex. 8, at 6.) Thereafter, Mr. Mullis did not file any other motion pertaining to Conner's mental health or requesting the appointment of an independent mental health examiner.

At trial, Conner did not testify and presented no evidence on his behalf. Mr. Mullis testified at the state habeas hearing that they discussed whether Conner would testify, and Conner did not wish to. Mr. Mullis agreed with this decision because he "frankly . . . felt that Mr. Conner might say something which would harm him and I could not foresee his testimony working to his benefit . . . ." (Resp. Ex. 19, at 34.)

The jury deliberated on the issue of Conner's guilt for 50 minutes. (Resp. Ex. 10, at 432.) Prior to the sentencing phase, the trial court granted defense counsel a recess for Mr. Mullis to confer with Conner. (Id. at 445-46.) According to testimony at the habeas hearing, the court recessed for "somewhere between half an hour and an hour." (Resp. Ex. 19, at 102.) The notes of the court reporter reflect that the recess lasted 15 minutes.[6] (Resp. Ex. 10, at 446.) When the

---

[6] With so many people involved in a death penalty trial, a recess of a mere fifteen minutes seems unlikely.

court reconvened, Mr. Mullis was asked whether he planned to

present any evidence in mitigation.  Mr. Mullis responded:

> Your honor, I had planned on calling four
> witnesses -- of course, the defendant, and his
> brother, and father, and his mother.  After the
> verdict came in I talked to Mr. Conner in a room
> adjacent to the courtroom and he has informed me
> that he does not desire me to enter any evidence in
> mitigation.  He does not desire to do that himself,
> he has told me.  I have counselled [sic] him that
> my advice would be to do otherwise.  My advice
> would be to put in some evidence to mitigate this.
> He has told me he does not desire to do that.

(Id. at 447.)  The following colloquy then took place with

Conner:

> THE COURT: Mr. Conner, do you understand your
> rights to present evidence?
>
> MR. CONNER: Yeah.
>
> THE COURT: And you have instructed your
> counsel and you are telling the Court now that you
> do not want to put anything in in evidence of
> mitigation?
>
> MR. CONNER: That's right.
>
> THE COURT: All right, sir.  That's your
> privilege.

(Id. at 447-48.)

Thereafter, the prosecution and the defense presented

their closing arguments without presenting any additional

evidence during the sentencing phase.  The jury returned a

verdict for the death sentence upon a finding of the statutory

aggravating circumstance under O.C.G.A. § 17-10-30(b)(7): "The

offense of murder was outrageously and wantonly vile, horrible

7

and inhuman in that it did involve depravity of mind and aggravated battery to the victim." (See id. at 466-67.)

## B.   Petitioner's Direct Appeal

Conner appealed his conviction and sentence to the Supreme Court of Georgia.[7] After an independent review of the prosecution's closing arguments and the death sentence as statutorily mandated,[8] the Supreme Court affirmed Conner's sentence and convictions on the murder and motor vehicle theft charges on direct appeal. Id. at 277. Conner's petition for a writ of certiorari to the United States Supreme Court was denied on October 3, 1983. Conner v. Georgia, 464 U.S. 865 (1983).

## C.   State Habeas Proceedings

Conner filed his first writ of habeas corpus in the Superior Court of Butts County on March 23, 1984, and received

---

[7]    The  Georgia  Supreme  Court  affirmed  Conner's convictions for murder and motor vehicle theft but reversed Conner's armed robbery conviction based upon insufficient evidence.  Conner v. State, 303 S.E.2d at 270-71.  The court also  affirmed  the  finding  of  a  statutory  aggravating circumstance upon evaluating the sufficiency of evidence as mandated by O.C.G.A. § 17-10-35(c)(2) and Rule IV(B)(2) of the Unified Appeal Procedure for Death Penalty Cases.

[8]    Pursuant to O.C.G.A. § 17-10-35(c)(1), the Georgia Supreme Court must determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor."

8

a stay of execution on that same date.  Evidentiary hearings were held on September 24, 1984, and February 11, 1985.

In the first evidentiary hearing, Mr. Mullis testified about his representation of Conner at trial.  He explained that although the insanity defense had crossed his mind, he found nothing to substantiate such a claim based upon his own observations of Conner and the CSH records.  (Resp. Ex. 19, at 32.)  When asked about the CSH records discussed above, Mr. Mullis admitted that he knew that Conner had some psychiatric problems and suffered from drug and alcohol abuse.  (Id. at 58.)  He further admitted that in seeking the appointment of an independent mental examiner, he did not reveal to the trial judge any of the information contained in the CSH records.  (Id. at 61-62.)

While considering potential mitigation, Mr. Mullis spoke with Conner's parents and brother.  He believed that Conner's parents had come to his office at least once prior to trial.  (Id. at 30.)  They discussed Conner's "upbringing and socio-economic information."  Mr. Mullis stated that he ascertained that Conner had a deprived economic background and had not been raised "in the best of circumstances."  (Id. at 31.)  After Conner was convicted (presumably in the recess before the sentencing phase), Mr. Mullis spoke with Conner's brother

about testifying in mitigation.[9]   (<u>Id.</u>)   Also during this time, Mr. Mullis approached Conner's girlfriend, Beverly Bates, who had testified against him at trial, about testifying in mitigation, but she refused. (<u>Id.</u> at 37.)   Mr. Mullis described Conner's parents and brother as "waiting in the wings."  (<u>Id.</u> at 31.)

Mr. Mullis then testified that his plan to present the testimony of Conner's family members changed when Conner informed him after the entry of the guilty verdict that he did not wish to put up any evidence. (<u>Id.</u> at 35.)   Mr. Mullis explained that Conner stated "something to the effect of letting [the jurors] do what they will." (<u>Id.</u> at 35, 95-96.) Mr. Mullis testified that he told Conner the purpose of the evidence but that Conner did not seem to care about himself. (<u>Id.</u> at 100-01.)

Between the first and second evidentiary hearings, Conner filed several affidavits in further support of his habeas petition.   At the second hearing, the state habeas court admitted into evidence the affidavits of Conner's mother and father; his sister, Linda Jones, and her husband, Phillip

---

[9] Of note, Mr. Mullis identified the brother as Herman - the one that testified for the State at trial. (Resp. Ex. 19, at 31.)   As pointed out by habeas counsel, however, the brother that testified at trial was Jack Donnie Conner. (<u>Id.</u> at 40; Resp. Ex. 9, at 283.)

Jones; and his sister-in-law, Sally Conner.[10]  (See Resp. Ex. 20, at 242-66 (admitted as Pet. Exs. 9-13).)

Conner's mother averred that Mr. Mullis had asked her and her husband if they would be willing to testify on Conner's behalf but had not gone over what their testimony would be. (Id. at 243-44.)  Conner's mother stated that had she testified, she would have said Conner was a good and loving son who worked hard and offered his earnings to the family. (Id. at 244.)  She stated that Conner was very close to his sister Linda and his brother Hermann.  (Id.)  She disclosed that while Conner and his father were very close, when Conner was young, his father had a drinking problem that caused him to beat the children, especially Conner.  She said: "[Conner] was whipped with belts, hit with branches and struck with fists and an open hand until he was well into his teens." (Id. at 245.)

His mother also testified that Conner was a "very troubled young man."  As a teenager, Conner drank and used drugs as "an escape."  (Id.)  She also averred that Conner was always nervous and depressed and that he felt unloved.  (Id. at 245-46.)  Conner had told his mother that he took drugs to stop himself from crying.  In 1981, Conner tried to kill

---

[10]  Sally Conner was the wife of Conner's older brother Hermann Carroll Conner, Jr., who died prior to executing an affidavit on Conner's behalf for the state habeas proceedings.

himself by hanging himself from a tree.   (Id.)   In sum, Conner's mother wished to tell the jury that Conner was "a devoted son who had many personal problems." (Id. at 249.)

Conner's father averred that Mr. Mullis never asked about other family members and friends who would be willing to testify on Conner's behalf.   (Id. at 251.)   He never asked about Conner's school or work background or his relationship with other family members and friends.   (Id. at 251-52.)   He stated conclusorily that the two times he and his wife went to Mr. Mullis' office, Mr. Mullis showed no interest in the case. (Id. at 252.)   Conner's father testified that Conner suffered from constant depression as a teenager and started drinking heavily, which only made his depression worse. (Id. at 252-53.)   He felt as though Conner needed psychiatric help but they could not afford it.   (Id. at 253.)

His father testified about another time that Conner attempted suicide by trying to cut the ropes holding him in a tree.[11]   Conner told his father that he was trying to have an accident so that he would fall and kill himself. (Id.)   His father averred that had he the chance, he would have told the jury that Conner was a decent, honest person and that he wished he had had the money to get Conner help for his

---

[11]   Apparently, Conner was working with his father in the tree surgery business.  (Resp. Ex. 20, at 244, 252.)

depression when he was younger.  (<u>Id.</u> at 255.)

The other family affidavits attest to these same facts about Conner, and each family member testified that Mr. Mullis never asked them to testify on Conner's behalf in mitigation. (<u>Id.</u> at 257-66.)

After the evidentiary hearings, the state habeas case was reassigned to several visiting judges.  A final order in the case denying relief was not entered until January 6, 1997. (<u>See</u> Resp. Ex. 17, Order of Jan. 6, 1997, at 1003-1061, hereinafter referred to as the "State Habeas Order.")

In the State Habeas Order, the court identified and addressed twenty-six specific allegations of ineffective assistance of trial and appellate counsel.  In particular, the court recognized Conner's claims that his trial counsel was ineffective for "'intolerably acquiescing' in Petitioner's decision not to present mitigating evidence" and for "failing to prepare evidence in mitigation." (<u>Id.</u> at 1035-36.)  With respect to these claims, the state habeas court made the following relevant findings of fact:

> Counsel was aware this was a death penalty case and [ ] discussed potential mitigating witnesses with Petitioner.  With regard to mitigation, counsel talked to Petitioner's family, specifically his parents and some siblings later.
>
> . . . .
>
> After hearing the verdict of guilty, Petitioner told counsel he did not want to put up any evidence.  Well before trial, counsel had gone

13

over the purpose of the sentencing trial with
Petitioner.  When Petitioner announced his desire
not to present mitigating evidence, counsel again
explained the function of the sentencing phase and
the ramifications of no mitigating evidence.  They
talked from a half hour to an hour.  Counsel
thereafter had the matter placed on the trial
record.  Petitioner did not appear to counsel to be
angry or upset but, instead, appeared "macho" and
determined to be tough.

Counsel's main concern about the sentencing
phase had been the possibility that the state would
introduce Petitioner's prior record into evidence,
which the state could do in rebuttal.  .  .  .
Although [counsel] planned to call Petitioner and
three members of his family, Petitioner elected to
withold [sic] evidence in mitigation and counsel
informed the trial court of this decision.  The
trial court then conducted a colloquy with
Petitioner, and Petitioner stated that he
understood his right to present mitigating evidence
and he did not want such evidence presented.
Counsel did give closing argument in Petitioner's
behalf.

(<u>Id.</u> at 1038-42.)

Upon these findings, the state habeas court employed the

<u>Strickland v. Washington</u> standard for determining whether

trial counsel had rendered ineffective assistance.  In doing

so, the court found that Mr. Mullis had attempted to convince

Petitioner of the need to present mitigating evidence but was

unsuccessful.  The court concluded that Conner knowingly and

intelligently waived his right to do so.  The court further

concluded that Mr. Mullis had prepared to present evidence in

mitigation, citing to his plan to call Conner and three family

members.  The court specifically noted that the family

affidavits did not overcome Conner's waiver or establish ineffectiveness. (Id. at 1057.)

## II.  LEGAL STANDARD

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides federal courts with specific standards of review of claims adjudicated on the merits in state court.  See 28 U.S.C. § 2254(d)(1), (2).  A federal habeas court may grant a writ of habeas corpus if the state court decision "'(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law [as determined by the Supreme Court of the United States], or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court . . . .'" Crowe v. Hall, 490 F.3d 840, 844 (11th Cir. 2007) (quoting 28 U.S.C. § 2254(d)).

The Supreme Court has stated that a state court's decision is "contrary to" clearly established Supreme Court precedent in either of two respects: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court nevertheless arrives at a result

15

different from [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000).

A state court's decision may be "an unreasonable application" of clearly established Supreme Court precedent in either of two respects: (1) if the state court identifies the correct governing legal principle from the Court's cases "but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u> at 407. The Supreme Court stated that the "unreasonable application" inquiry is an objective one, <u>id.</u> at 409-10, and instructed that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law," <u>id.</u> at 410 (emphasis in original). Thus, a federal habeas court may not grant relief simply because it concludes "in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>see also</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007) (The question "is not whether a federal court believes the state court's determination" under the <u>Strickland</u> standard "was incorrect

16

but whether that determination was unreasonable - a substantially higher threshold."); <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003). If the state court correctly identifies the governing legal rules, only the unreasonable application clause is relevant.

Finally, the factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to a deferential review. Factual findings by the state court shall be presumed to be correct, a presumption that will be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO ADEQUATELY INVESTIGATE AND PRESENT MITIGATING EVIDENCE

It is well established that the Supreme Court's two-part test announced in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), is the governing legal principle for ineffective assistance of counsel claims. In this case, the state habeas court correctly identified the <u>Strickland</u> standard in consideration of Conner's claim that his trial counsel failed to investigate and present mitigating evidence; accordingly, Conner's habeas petition arises under the "unreasonable application" clause of Section 2254(d)(1). This Court must therefore decide whether the state habeas court unreasonably applied <u>Strickland</u> to his claim. To prevail, Conner must

17

establish that the state habeas court's decision that his trial counsel rendered effective assistance was objectively unreasonable.  See Bell v. Cone, 535 U.S. 685, 699 (2002).

To show ineffective assistance of counsel under Strickland, Conner must show that his counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness," considering the circumstances at the time of counsel's conduct.  See Strickland, 466 U.S. at 687-92. Conner must also show that counsel's deficient performance actually prejudiced his case.  See id. at 694.

Here, as in Strickland, Conner contends that his trial counsel, Mr. Mullis, was deficient for failing to perform a proper investigation into potential mitigating evidence. Conner argues that the state habeas court's conclusion to the contrary is an unreasonable application of Strickland as announced in the following cases:  Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (finding that defense counsel's failure to investigate and present any mitigating evidence at sentencing in a capital murder case was deficient performance, where counsel failed to present record evidence of the defendant's substantial alcohol and drug consumption and lack of sleep before the murder, favorable expert testimony regarding the defendant's cognitive ability to conform his conduct to the law, evidence of the defendant's history of

18

drug and alcohol abuse, and evidence of his dysfunctional upbringing); and <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003) (finding that counsel's failure to investigate the petitioner's life history for mitigating evidence for the penalty phase of his murder trial, beyond reviewing a presentence investigation report and department of social services records, fell short of prevailing professional standards).

These cases, however, are not relevant to the case at bar. This is not a case where counsel failed to present mitigating evidence because he failed to investigate and discover such evidence; rather, this is a case where counsel failed to present mitigating evidence because the petitioner specifically instructed counsel not to do so. Here, the state habeas court found that counsel explained the importance of mitigation evidence both prior to trial and after the return of the guilty verdict and planned to call Conner's family members as witnesses. Nevertheless, Conner chose to waive the presentation of such evidence, "determined to be tough" in the face of a death penalty sentence. Conner has not rebutted these factual findings by clear and convincing evidence.[12]

---

[12] The state habeas court determined that Conner and his counsel talked from a half hour to an hour about the importance of presenting mitigation evidence after Conner informed counsel of his decision. (<u>See</u> State Habeas Order, at 1041.) This finding may be incorrect because the record shows

19

Thus, the state habeas court's determination that Conner knowingly and intelligently waived his right to present mitigation evidence is a reasonable determination of the facts.

In light of the waiver, a recent Supreme Court decision informs this Court's analysis of counsel's effectiveness: Schriro v. Landrigan, 550 U.S. 465 (2007), a case in which the client similarly impeded counsel's ability to present mitigation evidence. In Schriro, counsel had planned to call the birth mother and ex-wife of the petitioner, Jeffrey T. Landrigan, as witnesses. They would have offered that Landrigan "was exposed to alcohol and drugs *in utero*, which

---

that the court was recessed for only 15 minutes. (Resp. Ex. 10, at 446.) While a fifteen minute recess is also unlikely under the circumstances, I strongly doubt the recess lasted longer than thirty minutes. In any event, there is no evidence to rebut counsel's contention that he spoke with Conner prior to trial about the importance of mitigation evidence. Moreover, the amount of time it took for Conner to refuse to allow his counsel to present mitigation evidence does not negate Conner's resolve to waive the presentation of this evidence, particularly because Conner seemed not to care about himself.

Finally, given Conner's self-destructive attitude, Mr. Mullis was undoubtedly concerned that Conner may say something to cause himself more harm. I am mindful that Conner had been arrested for another homicide at the same time, and the trial court had ruled only moments prior to this recess that evidence related to this other charge would not be admissible. Admissible or not, Conner had already proved that he could open the door to such evidence; his prior statement that he had "kill[ed] them two sons of a bitches" had already been admitted at trial. (See Order of October 6, 2008, at 17.)

may have resulted in cognitive and behavioral deficiencies consistent with fetal alcohol syndrome.  He was abandoned by his birth mother and suffered abandonment and attachment issues, as well as other behavioral problems through childhood.  His adoptive mother was also an alcoholic, and Landrigan's own alcohol and substance abuse began at an early age."   Id. at 480 (internal quotation marks omitted).  However, Landrigan told them not to testify and instructed his attorney not to present any mitigation evidence.   Indeed, Landrigan told the trial court: "'I think if you want to give me the death penalty, just bring it right on. I'm ready for it.'"[13] Id. at 470.

The Schriro Court first noted that Wiggins and Strickland had not addressed circumstances in which a client impedes his counsel's efforts to present mitigating evidence.  Id. at 478.  Thus, in that respect, those cases were not instructive in consideration of Landrigan's ineffectiveness claim.  Then, the Supreme Court held that it was not objectively unreasonable for a court to find that a defendant who refused to allow the presentation of mitigating evidence could not establish prejudice based upon his attorney's failure to investigate possible mitigating evidence.  Id. at 477; see also Newland v.

---

[13] Similarly, Conner told his counsel to let the jurors do what they will.  (Resp. Ex. 19, at 100-01.)

21

Hall, 527 F.3d 1162, 1205 (11th Cir. 2008) (following the lead of Schriro in "drawing a distinction between a defendant's passive non-cooperation and his active instruction to counsel not to engage in certain conduct"); cf. Blankenship v. Hall, 542 F.3d 1253, 1277 (11th Cir. 2008) ("Significant deference is owed to failures to investigate made under a client's specific instructions not to involve his family.").

Upon the foregoing, the state habeas court's decision that counsel rendered effective assistance under the Strickland standard was not an unreasonable application of clearly established law. In particular, as in Schriro, Conner cannot establish prejudice from his counsel's failure to present mitigating evidence where he waived his right to do so.[14]

## IV.   PROSECUTORIAL MISCONDUCT

On direct appeal, Conner's only asserted grounds of error challenged the trial court's charge to the jury. (See Resp. Ex. 11.) Nevertheless, the Georgia Supreme Court reviewed the

---

[14]   The Court further notes that the Schriro Court also addressed a contention that Landrigan's waiver was not "informed and knowing." The Supreme Court pointed out that it has never imposed an "'informed and knowing' requirement upon a defendant's decision not to introduce evidence." Schriro, 550 U.S. at 478-79. Accordingly, neither this Court nor the state habeas court was required to make a finding that Conner's waiver of the right to present mitigation evidence was knowing and intelligent.

arguments of counsel to ensure that the sentence of death was not imposed "'under the influence of passion, prejudice, or any other arbitrary factor.'" Conner v. State, 303 S.E.2d at 272-73 (quoting O.C.G.A. § 17-10-35(c)(1)).  In its review, the court noted that the following comments of the prosecuting attorney in the both the guilt-innocence phase and the sentencing phase were improper:

> Ladies and gentlemen, as prosecutor, as defense
> attorney, I have been involved in criminal law for
> seven years.  As District Attorney of this circuit,
> I have prosecuted nine murder cases.  I have never
> before sought the death penalty.  I have seen
> several killings.  I have been responsible for
> prosecuting several terrible killings.  I have
> never before sought the death penalty.

(Resp. Ex. 10, at 398-99 (in the guilt-innocence phase).)[15] In the sentencing phase, the prosecuting attorney again noted: "As I told you, I have never previously sought the death penalty in any murder case, but I tell you, I am seeking it now."  (Id. at 450.)  The Georgia Supreme Court found the comments referencing "his prior criminal experience and the frequency with which he had sought the death penalty" to be

---

[15]  Mr. Mullis did not object to this statement, though he eventually objected to a line of argument concerning the death penalty, particularly once the prosecution told the jury that the only real issue before the jury was whether the death penalty was warranted since there was no doubt that Conner murdered the victim.  (Resp. Ex. 10, at 399.)  At this time, the trial court sustained the objection and instructed the jury that punishment was not to be considered in its deliberations.  (Id. at 400-01.)

irrelevant and unsupported by any evidence, and thus improper. Conner v. State, 303 S.E.2d at 276.  The court held, however, that the comments were not so prejudicial or offensive to require reversal of the death sentence.  Id.   In assessing the fundamental fairness of the closing arguments, the court held that the death penalty was not imposed "under the influence of passion, prejudice, or other arbitrary factor." Id. at 277.

In his state habeas petition, Conner asserted numerous instances of prosecutorial misconduct in opening and closing arguments and during the trial.  (See Claim Ten.)  The state habeas court found that many of the grounds were procedurally defaulted because they had not been raised or addressed on direct appeal.  (State Habeas Order, at 1021-22.)  Further, upon noting that the Georgia Supreme Court had reviewed the closing arguments, the state habeas court concluded that it was precluded from reviewing on the merits Conner's claim that closing arguments were fundamentally unfair.  (Id.)

In this Court's Order of October 6, 2008, I found that Conner had not established cause to excuse the procedural default of those prosecutorial misconduct claims that he had not raised or were not addressed on direct appeal.  Thus, this Court may only review those claims reviewed on the merits by the Georgia Supreme Court relating to the prosecution's arguments in closing.

24

In his merits brief, Conner focuses on two aspects of the prosecution's closing arguments which he contends were constitutionally impermissible. First, Conner claims that the prosecution's offer of personal opinion based upon his experience, as quoted above, was improper. Second, Conner claims that the prosecution improperly used an "armed robbery scenario" to impute a premeditated motive upon Conner in the closing argument of the guilt-innocence phase. Conner claims that in advancing this "elaborate tale," the prosecution peppered his argument with "fabrications of thoughts and conversations" between Conner and the victim that were not in evidence. (Pet. Merits Br., at 95.) Conner contends that the combined impact of these improper and irrelevant comments improperly influenced the jury to impose the death penalty because but for these arguments, Conner's crime would likely have appeared "less aggravated and less worthy of a death sentence." (Id. at 97.)

The difficulty in this case is that Conner did not challenge the closing arguments on direct appeal; and while the Georgia Supreme Court nevertheless reviewed the arguments of counsel, this Court can only be sure that the Georgia Supreme Court specifically considered the comments pertaining to the prosecuting attorney's personal experience. However, so as not to procedurally default any part of Conner's claims

25

here, I will assume that the Georgia Supreme Court scrutinized all aspects of the closing arguments in concluding that nothing in those arguments was so egregious to require reversal.

In doing so, as a federal court sitting in review of the state court decision on the merits, I must give deference to the state court's finding that the prosecution's arguments were not constitutionally infirm unless Petitioner can show that this decision was contrary to or involved an unreasonable application of Supreme Court precedent.    28 U.S.C. § 2254(d)(1).    In his merits brief, Conner only cites to Donnelly v. DeChristoforo, 416 U.S. 637 (1974), which stands for the broad proposition that an improper prosecutorial argument may so "infect[] the trial with unfairness as to make the resulting conviction a denial of due process."    Id. at 643.    Thus, the issue here is whether the Georgia Supreme Court's decision that closing arguments were proper unreasonably applied Donnelly.[16]

Improper argument by a prosecutor is fundamentally unfair if it is "so egregious as to create a reasonable probability

---

[16]    The "contrary to" clause is inapplicable because Conner does not show that the Georgia Supreme Court contradicted either the reasoning or the result of Donnelly. In fact, in Donnelly, the United States Supreme Court ultimately rejected the petitioner's claim that the prosecution's argument was fundamentally unfair.    416 U.S. at 645.

that the outcome was changed." Brooks v. Kemp, 762 F.2d 1383, 1403 (11th Cir. 1985). Here, Conner does not contend that his conviction was wrongly based on the prosecution's argument; rather, he challenges the imposition of a death sentence. Thus, Conner must be able to show that the prosecution's closing arguments were so egregious as to undermine confidence in the imposition of the death penalty. Here, Conner has failed to do so. In particular, despite the prosecution's argument that armed robbery could serve as an aggravating circumstance justifying the death penalty, the jury rejected this finding. Thus, the "armed robbery scenario" argued at the guilt-innocence phase was not a consideration by the jury in imposing the death penalty. With respect to the injection of personal opinion and experience, I conclude that the state court reasonably determined that these statements were not egregious. In short, I conclude that the state court's determination that the prosecution's closing arguments were not fundamentally unfair is a reasonable one.

## V.   ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY

Conner's third ground for relief is that his sentence of death was arbitrary and capricious, particularly in assessing his sentence against other sentences handed down in similar

cases.  On direct appeal, the Georgia Supreme Court conducted a proportionality review as mandated by O.C.G.A. § 17-10-35(c)(3).  In doing so, the Georgia Supreme Court found that Conner's sentence was not excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant.  Conner v. State, 303 S.E.2d at 277.  The court then cited several cases in support of its affirmance of the death penalty.  Id.

In review of this claim, the state habeas court found that Conner had not stated a violation of an existing constitutional right.  (State Habeas Order, at 1025 (citing Pulley v. Harris, 465 U.S. 37 (1984) (holding that a proportionality review in a state statutory scheme for imposition of the death penalty is not required if the scheme adequately ensures consistent and rational results)).)  Thus, Conner failed to state a cognizable claim for collateral review.

In his federal petition, Conner again raises the issue of the adequacy of the Georgia Supreme Court's proportionality review.  Conner claims that the Georgia Supreme Court failed to conduct a "meaningful" proportionality review, particularly because it failed to look to similar cases in which the defendant was given a life sentence.

I conclude that Conner has failed to state a cognizable

claim because he has not established the violation of any federal constitutional principle.[17]  In short, to the extent that Petitioner seeks to have this Court conduct a proportionality review of his sentence, he is not entitled to such relief.  See Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir. 1987) (citing Moore v. Balkcom, 716 F.2d 1511, 1518 (11th Cir. 1983) and Tucker v. Zant, 724 F.2d 882, 895 (11th Cir. 1985)).

### VI.   PETITIONER'S MOTION FOR RECONSIDERATION OF HIS MENTAL RETARDATION CLAIM (CLAIM THIRTY-THREE)

On October 3, 2001, after filing the instant federal petition, Conner filed a second state habeas petition in the Superior Court of Butts County raising the claim that he is mentally retarded and thus ineligible for the death penalty. This case was stayed pending resolution of the matter.

By Order dated October 26, 2001, the state habeas court dismissed the second petition as successive.  This judgment became final when the United States Supreme Court denied Conner's certiorari petition on October 7, 2002.

On September 8, 2004, this Court denied Conner's motion

---

[17]   Petitioner's citation to the Sixth and Fourteenth Amendment is insufficient.  He has not cited to any United States Supreme Court case in which the Court recognized a right to a meaningful proportionality review under either of these constitutional amendments.

for leave to conduct limited discovery for purposes of determining whether he is mentally retarded because the claim was precluded from federal habeas review under the doctrine of procedural fault. In the Order, I noted that it appeared that the state court's independent and adequate state ground for procedurally defaulting the claim was inconsistently applied to claims of mental retardation. (See Order of Sept. 8, 2004, at 9.) In so noting, I cited Turpin v. Hill, 498 S.E.2d 52 (Ga. 1998), in which the Georgia Supreme Court had held that because the execution of a mentally retarded person violates the cruel and unusual punishment provision of the Georgia Constitution, as held in Fleming v. Zant,[18] the issue of mental retardation could not be procedurally defaulted by a state habeas court. Yet, I further noted that the Georgia Supreme Court had not only denied Conner's application for a certificate of probable cause ("CPC") on his second petition concerning his mental retardation claim, it had also denied the CPC application of Robert Karl Hicks, a petitioner under circumstances similar to Conner. See Hicks v. Schofield, 2004 WL 1470602 (Ga., July 1, 2004). Thus, I concluded that the

---

[18]   In Fleming v. Zant, 386 S.E.2d 339 (Ga. 1989), the Georgia Supreme Court held that the execution of mentally retarded persons constitutes cruel and unusual punishment under the Georgia Constitution. The United States Supreme Court's decision that the execution of the mentally retarded violates the Eighth Amendment did not come until 2002. See Atkins v. Virginia, 536 U.S. 304 (2002).

30

Supreme Court of Georgia was signaling a reversal of the Turpin v. Hill rule. In the end, I pointed out that jurists of reasonable minds may differ on the issue of whether a mental retardation claim is subject to the procedural default doctrine barring its consideration in a federal habeas court. (Order of Sept. 8, 2004, at 14.)

Of note, Conner's motion to reconsider the Order of Sept. 8, 2004, procedurally defaulting his mental retardation claim, was filed on May 7, 2009, over four years after the entry of this Order. It was also filed six months after this Court entered its Order procedurally defaulting many of Conner's other claims and reaffirming the procedural default of the mental retardation claim. (See Order of Oct. 6, 2008, at 26.) Thus, I find Petitioner's present motion for reconsideration to be dilatory. Accordingly, Petitioner's motion for reconsideration (doc. no. 69) is **DENIED.** Nevertheless, as noted in the Order of September 8, 2004, a certificate of appealability is appropriate on the issue of whether a mental retardation claim may be procedurally defaulted.

### VII. CONCLUSION

Upon the foregoing, the Petition for Writ of Habeas Corpus is **DENIED.** The Clerk is directed to **ENTER JUDGMENT** in favor of Respondent and **CLOSE** this case.

The Court **GRANTS**, however, a Certificate of Appealability to enable Petitioner to argue on appeal that this Court may have incorrectly determined that his mental retardation claim is procedurally defaulted.

**ORDER ENTERED** at Augusta, Georgia, this _____ day of November, 2009.

_____
UNITED STATES DISTRICT JUDGE

32